Good afternoon. We have Prometheus Radio Project versus the Federal Communications Commission et al. And it's number 17-1107, 1109, 1110, 1111, and 18-1092, 1669, 1670, 1671, 2943, and 3335. And I know in the past we have gone inordinately long in the Wayback Machine back in 04. I think we went something like eight hours. Today, I promise you we'll try to stick to the schedule. Knowing this panel, that's not exactly something we normally do well. So we may vary a little bit, but we will do our best to try to stick to the schedule that you've agreed to. And with that, whenever you're ready to begin. May it please the Court, I'm Jack Goodman. I represent the Independent Television Group. I would like to reserve two minutes for rebuttal. That's fine. The FCC in every ownership review since 1999 has concluded that commonly owned and operated television stations devote additional resources to news and other public affairs programming, and that common ownership results in higher viewership for the acquired station, which the Commission has concluded has welfare-producing benefits for the public. This Court has upheld those conclusions, but the FCC each time decided that the risks of consolidation outweighed the benefits. Does common ownership also affect viewer point diversity? I mean, does it not? The Commission found in this order that it did not. There has been a large amount of the programming on these stations are, of course, networks, which doesn't change whether it's owned. And the extent to which there is any viewpoint in local news is a hotly debated topic. I wonder, maybe rephrase the question, if you own CBS, if you own NBC, if you own, let's just say two, you control the viewer point of those outlets, don't you? In theory, yes, but in fact, in practical consequence, Your Honor, most of those decisions are made actually in terms of local news by local news directors, local reporters, people like that. There has been no study which really indicates that the Commission has accepted that there is a decline in viewpoint diversity. And indeed, since the second report in order, I'm sorry, since the 2006 biennial review, the Commission has not founded these rules based on diversity, but only on competition because it found they were not relevant to diversity. So then you're reducing competition, right? The Commission said in some ways they do, but in other ways they do not, because the Commission in this particular proceeding found that the increase in competition for local TV stations from cable, from satellite, from over-the-top services and from the internet threatened the survival of local television and their ability to make commitments to local news programming. So the Commission found that there was vastly increased competition, which required that they permit additional efficiencies for a locally owned TV station, and in particular found that those efficiencies were most needed in what the Commission characterized as revenue-scarce small and medium markets. Unfortunately, what the Commission did not do was recognize that those markets are the ones where its top four ban had particular impact, and the benefits it saw from consolidation for revenue-scarce small and medium markets could not be obtained because in 79 television markets, there are four or fewer local commercial full-power TV stations, and in those stations, there is no consolidation. The FCC did not conclude, and it could not have based on the record, that the benefits of more efficient operation only occur from combinations of non-top four stations. Indeed, it recognized that top four stations, and this is particularly true in small and medium markets, are the only stations providing local news. Thus, the increased investment in local news programming that the Commission sought to encourage in small and medium markets could only occur from combinations that it continued to block. That inconsistency alone is sufficient for you to find that this Commission's decision was arbitrary. Is it the same kind of line drawing that gives agencies the greatest amount of discretion? Your Honor, that is correct, but in this case, after 20 years of examination, the Commission could point to no example of a market where consolidation had actually reduced competition, reduced programming investment, reduced viewership of the second station, and at some point, the Commission cannot simply continue to draw lines based on its own suppositions. It recognized that with respect to the eight voice test, a decision that is not questioned in this court, because it found there that its speculation as to the impact of in the record, and it said because of that, we cannot continue to simply rely on our supposition. The same principle applies with respect to the top four rule. The Commission found no more evidence with respect to that than it had with the eight voice rule, but it did not go through and complete the logic of its decision. It makes three arguments that in support of its decision, and none of them withstand scrutiny. The first, it argues that combinations of top four stations would reduce competition for viewers and advertisers. It says it made this finding anew in every single ownership review, but in fact, it did not. In fact, all it did was recite its decision from the previous ownership review, going back to 2003, where it did make that no facts whatsoever. I thought there was a site to the fact that the delta between number four and number five was quite significant. That's a somewhat different point, Your Honor, but I'll be happy to turn to it. The Commission continues to find that in some markets, there is a cushion, a ratings cushion between the fourth and fifth station. It did not explain in this or any other proceeding how many markets that occurred in, or what the significance of that cushion was in terms of creating an incentive for, incentive or disincentive to compete. What is the rationale for the top four rule of the FCC? The FCC's rule, the FCC says that it is designed to preserve competition, but in fact... Isn't that a good and worthy goal? If they had evidence to support that it did so, Your Honor, it would, but it's the same that evidence over 20 years showed that it did not advance competition, and in fact, the threat of competition from other sources, particularly in revenue-scarce, small and medium markets, required more efficient ownership. So if there were no other TV station, if there were no other sources of video programming, perhaps it could justify it. While it's in the FCC's purview to make the rule, they have no studies to justify it, is that? That is correct, Your Honor. I guess we'll hear from the FCC about that. And in particular, they do not explain how this ratings cushion between the fourth and fifth stations has any relevance to the mark 79 markets where there is no fifth station, and yet the commission continues to prohibit any combination among top four stations. Even the commission recognizes that this rule is overbroad and does not apply in a number of circumstances. In fact, it made that same recognition in the 2002 biennial review. So the commission, rather than narrowly tailoring the rule or repealing it altogether because it recognizes it's vastly overbroad, the commission merely threw in a waiver procedure. The commission did the same in the 2002 biennial review. This court reminded the commission then that it could not save an irrational rule by tacking on a waiver procedure. And in fact, the waiver procedure that the commission says it adopted the new here, but in fact has been in place, is similar in terms it has no standards. And in the 17 years since the commission adopted that waiver procedure, it has not granted one waiver. And indeed, with respect to the waiver standard that they adopted in this report and for a new top four combination, and that has been pending or languishing at the commission for more than 13 months with no action whatsoever. Thank you. And we'll get you back on rebuttal then. Pardon? We'll get you back on rebuttal then. Okay. Thank you very much. Thank you. So I'm at least trying to say I may not succeed. Good afternoon, Dennis Lane for MMTC and NABOB. I've requested two minutes for rebuttal. Sorry. We challenge the comparative, yes, the comparable market definition on two grounds. First, that the commission did not apprise the parties that the comparable market definition would be used in the original notice of proposed rulemaking. And as you will see in the comments, there are only two comments that address this issue. And they both addressed it in the same terms, the similar size market that had been addressed in the notice of rulemaking. You don't think it was the incubating program itself, do you? No, we don't. Well, let me say it this way. If you, if the comparable market definition is eliminated and we go back to the similar size market situation, we would be in favor of the incubator program. By comparable market, you mean that the waiver should be exercised in a market similar to the one in which the incubation occurred? Well, so the difference is in the original notice of proposed rulemaking, they said similar, it should be in a similar size market. In our view, and we believe that the parties view, and certainly the only two comments, use that term similar size market to mean population. And by the Nielsen rankings. I read the notice a bit differently. I'm reading it now. How should the commission structure the waiver program? For example, should the waiver be limited to the market in which the incubating activity is occurring? Alternatively, should waiver be permissible in any similarly sized market? How would the commission determine which markets are similar in size? That seems to me to be awfully open-ended. They're asking for advice. Well, and they incorporated the local radio ownership rules, market tiers doesn't seem to me to be that different. The difference is this, Your Honor. Everyone, I think everyone certainly, there are only two comments. They both, NAB specifically relied on the Nielsen rankings. So everyone, in the broadcast industry, I'm sure you've heard of the top five markets. I don't know what Philadelphia is, I don't know the 11th or 12th market. Everybody knows what those rankings are. So similar size people were expecting, at least per the comments, that that would be how it would be judged. If you were larger, you could move up. That was the argument. Could you only move up? But just to supplement that, didn't the commission ask for comment on how to determine which markets are similar in size? I mean, they asked for comment. They did ask for comment. There's no question about that. And so that doesn't indicate that there's multiple ways of defining size that are under consideration by the commission? I don't think so because, just to go back to your point, even though they did mention the local ownership rule, that's based on tiers. So depending on how many radio stations are in your market depends on what tier you're in. They didn't say anything about similar tiers in the Notice of Proposed Rulemaking. They just said similar size. And I think, to answer your question, Judge Ambrose, people understood that as meaning similar in size, similar in population, based on the Nielsen rankings. And I think the other point that shows that, as soon as the white copy came out and they came up with the comparable market definition, we came in, NAB came in, and we said, wait, this is a big problem. That's what we're worried about. So the fact of the matter is, yes, you could term this as being as broad as possible. But no one did. They thought it was very limited. And it was only when they changed to the comparable market definition that people realized, wait a second, this is not going to be similar in size. It's going to be based on tiers. And that's pretty different. We cited a case where the, I believe it was the EPA, but whatever, the agency in the notice set a minimum that was going to be the standard. But in the rule... But what's the problem with a numerical tier? The problem with a numerical tier is that it creates a situation in which you can incubate on a very small market, we use Wolf-Berra, which is market 77, a relatively low-cost market, and then get a waiver, just for example, in New York City... Let me take that example. What's the... Why isn't that reasonable? What's the problem with that, even if that is exactly what happens? The problem with that, Your Honor, is that that freezes out minorities and women from getting ownership in the larger markets where the largest diverse populations are existing. And as you might have seen from the statements in our affidavits, that in smaller markets, it's very tough to make a go of it, where in larger markets, it's easier. That's the wrong word. You can make enough money. So the problem with it is that minority and women are being incubated. But allowing the incubator to go into a larger market, might that not be an inducement to get incubators in the first instance? Of course it is. The question is how much incentive do you need with a similar-sized market? Well, let me just talk about what NMTC's proposal would be, just to give you an example. What we suggest is that only in the top tier, that is, the markets with 45 radio stations or more, you should only be allowed to incubate within five market sizes. So yet in that situation, yes, you could market up, if you will. That would be the incentive. But the point is, you would be giving the incubating minority radio station a chance to be in a larger market. The problem is, if they're going to be in Wilkes-Barre or the other smaller markets where you could also incubate up to a very large market, that's not an advantage for them. And it's a big advantage for the incubating owner, because for a relatively small investment, it gets a chance to wave into the largest markets. Thank you. Thank you, Leantha. Good afternoon, Your Honors. Cheryl Leantha for Prometheus Radio Project et al., and I'd like to introduce our next panelist. In 2016, in Prometheus 3, this court found and said, enough is enough. Yet here we are for the third time, the FTC having sidestepped again its obligation to consider the impact of its ownership rules on race and gender ownership diversity. In so doing, it has fallen far short of its obligations under the Administrative Court. Can I just ask you to clarify something that you noted in page 11 of your reply brief? The opening sentence in Part B is, Petitioners nowhere contest the FCC's decision not to adopt race-slash-gender-conscious rules in the decision under review. Correct. So what are you now challenging then? We're challenging the failure of the FCC to take into account the impact on race and gender ownership diversity of its orders. So, for example, when it permits consolidation, that means fewer owners, which means fewer opportunities for people of color and women. When it creates an incubator program or it creates an eligible entity definition, it's not actually promoting race and gender diversity. My clients have very much focused on race-neutral opportunities to increase the number of people of color and women of color. So we believe that the FCC takes the view that any program it implements along gender, race, or race distinctions would not survive constitutional scrutiny. Could you comment on that? Sure, Your Honor. I think this is part of the problem that the FCC has not done its homework. The FCC needs to have sufficient data. Right now, the data it has would not allow for an analysis that would permit such a conclusion. And that's why one of the requests we had for Your Honor this morning is a directive that the data be corrected. What kind of data are you talking about? I'm having trouble following the... Sure. Your Honor, the FCC collects ownership data every other year. It's on a Form 323. So we call it the Form 323 data. And every year, every single broadcaster in the country is supposed to tell the FCC who owns the stations. And then the problem that we're having with the data is that the entities often don't file every year. So you might think that you're seeing a drop-off and say women own stations, but in fact, it's because an entity hasn't filed. Or there's a numbering system that the FCC uses. It's a disaster. And so we can't track the changes over time unless the study impacts... I thought there was an improvement from 2014 in the 323 that more data was being collected. Am I wrong about that? More is being collected, but we're not there yet, Your Honor. And I don't believe the FCC... In fact, the FCC concedes in its decisions. In fact, the comparison between the two sets of data that we're most concerned about, the FCC concedes that the ownership data cannot really be used to make a year-by-year comparison because the different reporters go in and out of the data set. But the FCC is under a directive from our court to take some action to decide whether these ownership rules still make sense. Correct. And they made a finding that they will not negatively impact opportunities on the basis of race or gender. Yes, Your Honor. Why can't they move ahead with that and continue to do studies on these matters and see what happens? Well, there's multiple reasons. In fact, Your Honor, this data comparison that the FCC used to conclude there was no impact is basically a litany of the errors an agency can make under the Administrative Procedure Act. So an initial level... It's arbitrary and capricious. I'm sorry? So they've acted arbitrarily and capriciously. Yes, they acted arbitrarily and capriciously because in the second reporting order, they found that the same data set was insufficient to justify relaxation. They were asked to use it and they said no. And then in the reconsideration order, the very same data, the very same paragraph they refer back to and they say, oh, yes, now we think it is sufficient to justify further relaxation. Further, there was no notice. In making this comparison, they divorced 30 years of connection between ownership rules and race and gender ownership diversity, and they never gave any indication that they would be separating these two issues, nor did they give any indication that they would be comparing these two data sets. These two data sets are collected in very different ways, and comparing the two of them is like comparing apples and oranges. And the FCC's record concedes that there's flaws and inaccuracies in these data sets, so actually comparing them is like comparing rotten apples to rotten oranges. There's incredible... Further, that comparison did not consider women at all, which is exactly the error that Your Honor has pointed to in Prometheus 2 when the FCC tried to justify its eligible entity definition, but made no reference to the impact on women owners. Let me go back to Judge Ambrose's question on page 11 of your reply brief. Petitioners nowhere contest the FCC's decision not to adopt race-gender conscious rules in the decision under review. So does that mean you're not pressing an SBD or an ODP? No, Your Honor, we're not. We are asking the FCC to look at the impact of its rules on race and gender ownership diversity. For example, for years, Your Honors have looked at the failing station solicitation rule, right? Is that promoting diversity? Are we getting more women and people of color in ownership positions because of this rule or not? That rule is not a race and gender-specific rule, but it can still promote diversity. Similarly, one of the decisions in this case below, the FCC no longer is attributing ownership for those joint sales agreements. So one company can control another, but not count as an owner. And previously, when the FCC did attribute those owners, it meant that certain stations were spun off. And in fact, one of our declarants was able to obtain a TV station for the first time because of that rule. That rule is not race or gender-specific, but it does promote race and gender diversity. We believe that's the way that FCC should move ahead. We also believe that there are two other errors the FCC made below the two eligible entity definitions, including the radio-only incubator order. So the eligible entity definition adopted is the same revenue-based definition that this court has remanded twice. To get around the remand, the FCC left the goal in place but moved the goalposts. So the FCC now concedes that there is no benefit to race and gender ownership diversity from this rule, which was previously, as your honors explained, the linchpin of its diversity efforts. And the problem with this is when you hypothetically intended to promote race and gender ownership diversity, a goal that the FCC continues to adhere to, first of all, the radio incubator program will not help diversity in television at all. So we have nothing left to promote diversity in television at all. Secondly, the record is undisputed that under this slightly different eligible entity definition in the will not be women and people of color. So this definition, once again, just as you critiqued in Prometheus 2, it lacks sufficient analytical connection to the goal. Could you put something in context for me? I've just been curious about ownership of radio and TV broadcast outlets versus the internet and versus cable. It seems like the internet and cable are becoming more and more and more dominant while the ownership of actual broadcast outlets is diminishing. Could you talk about that a little bit so I can put this with some perspective? How important is this? It's very important, your honor. There's a couple of reasons. First of all, cable is almost universally national news, so it's not local news. And second of all, in fact, still the vast majority of local news media on the internet is coming from existing sources, such as your local television station that puts its news on the internet or your local newspaper that puts its news on the internet. In fact, still polls show that the most important source of local news and information is still broadcast television. And in fact, in some ways, people are moving more to reliance on broadcast television than they have in the past. If your honors are so inclined, I did want to spend a few minutes on release. We believe that... What makes you think a master is the right way to go? Sure. Well, your honor, we've all been here a number of times, and our focus would be on to be sure that this time we're able to, when the FTC makes its next decision, that we're debating substance rather than the absence of a record. And so, as I said earlier, the FTC did not do its homework. And when you don't do your homework, you need close supervision and interim deadlines to make sure you get to the goal. So, for example... That has nothing to do with the master, does it? Well, we're open, your honors, if you had another solution. We're trying to be thoughtful, particularly in light of your discussion in Prometheus 3 with regard to how to structure relief. We want to be sure that my clients are protected and everyone is protected. And one of the most important things, as I said, is that the FTC's data is still poor, and it would be a ministerial action for the FTC to correct some of this data. What do you want the FTC to do? Well, for example, your honors, one of the studies that's in the record, this free press study out of the picture and off the dial, what they did is they went in and they looked to see if a particular licensee had filed in one year and not the other, since the FTC tracks transactions, they could tell who was the owner of that station. So, it's kind of going back and filling in the holes. And as I said, a small nonprofit did, I think, both of those studies in about 800 person hours. So, it's a task, but it's not an insurmountable task. And that would mean that all these studies that the FTC says it can't do and why it's relying on admittedly flawed data could be completed. They're at fault for the reason that we can't have this analysis in the first place because they're collecting the data. And then we thought, your honors, you know, the FTC has a range of excuses. They say, well, we can't measure viewpoint diversity and their small sample size. And there's all these reasons why they can't study the exact thing that your honors have asked them to study and that they need to study under the public interest standard. And so, if we thought if we had expert recommendations, that would sort of be an independent test by which to judge. But even in the Ruiz case that's cited, it was a master appointed to observe in a prison setting not to direct action be taken. Correct, your honors. So, the action that we would ask this court to direct is to correct the data and to then we would think to correct the data, yes, because they can fill it in. And like we have said, there's a study in the record that shows that the data can be improved dramatically to the point where many more of these comparisons can be made. And then secondly, I think the special master would probably be the most helpful with regard to the idea of coming up with a common set of experts who could get around some of these more scholarly questions of how to measure some of these things. So, we believe, your honor, that also vacature of the reconsideration order is extremely important. We think that this case meets the test that you outlined in Prometheus 3, that the FTC cannot justify these rules. The basis upon which these decisions are made is rotten and is thrown out a third of the public interest test. And the FTC was on notice. And, in fact, in every other previous case on this matter, you have vacated portions of the decision. So, a combination of vacating the reconsideration order and relief with regard to the data and Mr. Lewis. Can I please report? Jacob Lewis for the FCC, with me at council table is Matthew Dunn, also with the FCC, and Helgi Walker, who represents the interveners. I'll be discussing the citizen petitioner's challenge to the commission's orders, along with the MMTC and NABOP challenge to the incubator order. Mr. Dunn will be discussing independent television groups challenge to the top four commission's decision to retain the top four rule. And Ms. Walker will be presenting the industry's perspective in support of the commission, including the issue of remedies. Your honors, I think you've seen the argument so far that a citizen petitioner's challenge to the commission's orders is extremely narrow. The citizen's petitioners do not take issue with the commission's determination that as a general rule, common ownership between newspapers and broadcast stations, between radio stations and television stations, and between small and among small and mid-sized television stations can give rise to important efficiencies, a devotion of resources, which can lead to innovative and improved programming. Their sole challenge to the commission's order is that the commission didn't consider the impact of its rule revisions, which were otherwise justified by these efficiencies. It didn't consider the impact of those revisions on minority and female ownership of media properties. But the fact is, your honor, that the commission did quite directly consider that impact. It's discussed with regard to each of the rule revisions in a separate discussion, paragraphs I can cite in the order, but they're a separate heading that discusses the impact. And the that it was revising. Could you detail that a little bit more? I mean, Ms. Beyonce was arguing that there was no study, no data of the impact on female ownership. So maybe you could flesh that out a little bit more. So on the commission's analysis of the available data, paragraph 77 of the second report in order, with regard to television, and paragraph 126, the same order with regard to radio. And what the commission found, this is basically the one previous time the commission had loosened rules, its ownership rules, was for TV in 1999 and for radio in 96. And it looked at the available data, which admittedly is not perfect. I was going to ask you what data specifically? Right. Well, they looked at NTIA, the National Telecommunications and Information Administration had been at the time, the entity that was tallying whether there were minority-owned broadcast stations, television stations. Do you stick with the gender issue for a moment? Well, there were no, there was no data. If you're specifically focusing on data, the data that was available for those rules loosening back in 99 and 96, did not, NTIA did not take account of gender, of female ownership. So there was no data with regard to female ownership. It seems like there's attention even within your own briefing. When I look at page 40 of your brief, 14, it says what you just said, but no data on female ownership was available. Next sentence, the FCC reasonably relied on the data that was available. So either there's no data or there's some data that was available. Well, I think the data that was available went specifically to minority-owned media properties. We're not saying there was any in 99. Now, remember, we're talking about looking back at a change that occurred now, 10 years ago. I'm sorry, 20 years ago. This case has gone on for a decade at a time. But, and that data was available, was available only with regard to minority-owned stations. But the commission looked at the trend line for that data and it's, and said with respect to minority-owned stations, there was initial number of, I think the number for NTI was they were starting point of 32 minority-owned stations. The commission loosened the rules. After an initial decline, there was in 2000, looking at that now at the commission's own 323 numbers. Isn't that a significant departure from your obligation under the statute to always check gender ownership as well as minority ownership? Well, Your Honor, we're just talking now, and it's a very good point. Sometimes agencies don't have any data at all on an issue. And where data ends, that's when the commission's judgment begins. So the fact that there's no data on female ownership just puts us, say, for example, if we had traveled back in time in 99 before the commission had done its first loosening of the rules, and the commission was trying to determine whether or not it would be in the public interest to loosen the rules, for the very first instance, it wouldn't be paralyzed because there was no natural experiment upon which it could draw. It would then just talk about, exercise its judgment. Here, what we have is a combination of data, which admittedly goes to minority ownership, but also judgment. And I'd like to also point out that the commission explained that looking at the revisions it made, elimination of the newspaper broadcast ownership rule, it looked at the comments on that and it found that there were minority organizations representing minority-owned broadcasters and minority-owned newspapers. For the moment, we're talking about the gender balance. And the problem you have is – or we have – I mean, you've got 47 U.S.C., 347J, and it talks about minorities and women. And in that context, if there is no data available, it becomes 10 times 0 is 0. I mean… So I will grant your honor. So assume you just say, look, with regard to women ownership, female ownership, we have nothing with regard to data. That doesn't mean that the commission satisfies under its obligation under the ABA to reasonably explain why it took the action it did. For one thing, your honor, minority and female ownership is one aspect of the commission's analysis of diversity. The commission, under 202H, which governs the commission's – this quadrennial review and the commission's order in the 2010 and 2014 quadrennial review, which is before the court, 202H asked the commission to determine whether the revisions are in the public interest. The commission has traditionally analyzed that, analyzing whether they are… Are you telling me that 347J… 309J. 309J. Sorry, I apologize. Don't mean to get in the weeds. 309J is not in the public interest? I mean, Congress told us that, right? 309J, which talks about promoting minority and women ownership in a different context, broadcast auctions, is certainly a source of authority the commission can draw upon generally to say that it – and it has had a longstanding policy of promoting minority and female ownership. But 202H, which governs the review of this rule, says there is a broad increase – well, I guess what I would say, your honor, is minority and female ownership is certainly an aspect of the public interest. The impact on minority and female ownership is certainly an aspect. Is it really that difficult to determine female ownership of radio and television stations? Do you have license applications? I mean, it is a Senate obligation on the part of the FCC, so I'm trying to understand really how difficult it is, you see, to suggest it's very difficult. But I'm thinking, why is it that difficult if you have license applications, if you take some sort of survey to determine female ownership? Is it… So, two aspects to this. First of all, with regard to the data with what happened in 1999 and 1996, it's made more difficult. There's the initial task of taking the data in, but we're talking about figuring out what the state of the world was 20 years ago. The people who are around are no longer around, many of them, to ask whether they're in business or the information isn't available. This is kind of a… If this case continues long enough, none of us in this room will be around. Yes, well, hopefully it won't continue that long. But if I could explain, so there is a difficulty with regard to what I would call the about how difficult is it generally. The commission has improved its data collection over the years, and I think now, going to Ms. Lianza's point about response rates, which is one difficulty, you will ask people, sometimes they don't answer. The response rates, certainly for television 323 forms, have gone up by Ms. Lianza's own concession to 99 percent, so that's been a big improvement. Some of the briefings, the commission has improved the… Its simplicity is still at zero, just on gender. We haven't left that question yet. I mean, how do I get… And the problem is, even to flip for a second to minorities, the 1990s is NTIA, which is sort of one set of data, and how do I know that conforms with the 2009 survey, or whatever it was, on the form 323? Well, I'm not saying that… How do I get these apples and oranges to be comparable? Well, sometimes you only have, because you're engaged in a historical inquiry, you only have apples and oranges. I mean, they were both looking at the same thing, but admittedly, over the years, you're comparing… The commission was comparing NTIA data with its own 323 data. What was the total number of stations out there? Well, that's a good question. In 99, and then in 2009? I think the number of stations has gone up, which the commission emphasized. There's got to be a number. I don't know what the number is. I don't have it in my fingertips, the increase between 99 and, say, 2009. I'm not talking about the number of minority and… No, no, I understand. It's what… Total number of stations. And the commission could have looked at that. So that's why I don't want to over-argue what the commission's analysis was. It did not try and improve imperfect data to make it less imperfect, but still imperfect. What it was doing with looking at the data was to say, look, we don't see sufficient evidence of an adverse impact on minority and female ownership. In essence, the commission said, look, it's a wash. At best, it's a wash. We're not going to… There's a line in the commission's order that says we can't retain rules in their present form and refuse to revise them if there are burning reasons to do so for competition reasons and no impact and localism reasons. On the unsubstantiated hope that there is some adverse impact on minority… But in order to make that assessment, we've got to have facts and just a basic fact. How many stations are there in total out there 20 years ago and 10 years ago? I don't know. There's nothing in the report that I could find. And how can we make a reasoned decision, yay or nay, in terms of what the commission's done if neither of us has the facts? I guess I would push back on this. I agree. I will concede that the commission could have done more to try and adjust for how much of the increase might have been due to an increase in the total overall number of stations. But I think we're focusing too much on that particular aspect of the commission's reasoning because I want to make clear the commission had three… There were three ways in which the commission was looking at this. One was to look at the data and say, look, if anything, we see an increase in the number of minority-owned stations as a result of our loosening of the rules. And so the general proposition that loosening the rules automatically leads to a dramatic long-term impact of minority that we have. But to take your honest point, I'm not sitting here and saying the commission's analysis was perfect on that, but it was at least allowed it to give some suggestion about whether or not there was an impact the other way. The only explanation I could get was the belief that if we venture into this land of consideration of minority interests and gender interests, it's going to be unconstitutional. It was unconstitutional with respect to minorities because there would be a strict scrutiny standard that cannot be met. But no discussion that with respect to gender, for example, it's not a strict scrutiny standard. It would be intermediate scrutiny based on everything we know. So it raises another set of important issues here. We have the 202H inquiry with regard to the order we issued. Then we have this general question about what further measures the commission could take to promote minority and female ownership. On that question, I think the easy answer is that the citizen petitioners have abandoned at page 11 of the reply brief, any challenge to the commission's determination that it could not engage- They haven't abandoned that you've got to come up with the facts and the information in order to make a reasoned decision. Well, your honor, this isn't the, in that aspect of their argument, they're just asking for the untethered to any commission- Any data on gender would be better than zero, right? Well, your honor, I think the APA requires the commission to come up with the data to support its decisions. It doesn't require it to continually try and get more and more data without regard to any particular decision. I think what citizen petitioners essentially want is the commission to continue to study this problem for their benefit or for a benefit of scholars, but not for the commission's benefit. The commission has studied this issue. It talked about when it explained why another further disparity study was not reasonable for it to engage in another way. But isn't their interest to have gender diversity in ownership of radio and television, broadcast radio and television? Yes, your honor. To have the FCC ensure that that is taking place? Well, I mean, I guess I just want to make clear that we have two aspects in which the gender diversity question come up. The 202, you have before you to review the commission's revisions to its ownership rules. And in that, minority and female ownership is an aspect of the commission's public interest inquiry. But it's not the only aspect of the commission's public interest inquiry. Here, what the commission found was there was insufficient evidence that the rule revisions- Now, I'm focusing on what the commission actually did. The rule revisions were not in the- That there was no evidence that the rule revisions would cause an adverse impact on minority and female ownership. The absence of data doesn't switch that question. It's still no evidence that it would have an adverse impact. And it's not as if there's any evidence that it would have an adverse impact. But the other side of the equation is equally important. There were really compelling public interest reasons, both with regard to competition and localism, about why these combinations ought to be allowed. As the commission explained at length, the newspaper industry is not what it used to be. There are a wealth of independent information sources, given the internet and other online sources. The need for the rules is just simply not there. And to hold all of those rule revisions in paralysis because there's no specific data that they would have an adverse impact. Your position then would be that the FCC has met its obligation, statutory obligation, as well as our directive to ensure minority and racial or ethnic participation in the market. Yes. And here's what I would say with regard to the quadrennial review, the obligation is for us to look at this every four years and see whether there are revisions to our ownership rules that are in the public interest. We considered all aspects of the problem, including the impact on minority and female ownership, which we found to be no evidence that there would be an adverse impact and considerable reason to suggest that the other need for the rule revisions would be in the public interest. If we were to affirm you on that, I can just see the various blurbs and websites that would say Third Circuit plunk statistics 101. You can't affirm something when there's no evidence. You can't affirm something when the data sets from the 90s and 10 years ago are vastly different in terms of how they come to whatever information that they have. And we don't even know today the total number of stations out there, so we can't really do a percentage. So I guess for these purposes, for purposes of argument, let's assume that those paragraphs that discuss that data were not in the order at all. Okay. We have, the commission did have other reasons, not with regard to the data, about why the rule revisions were in the public interest. And I want to make clear, so I'm willing to concede, if you just decide the commission did a terrible job with regard to the comparison of what Miss Landers called apples and oranges, fine. Put it to one side. Bracket it. I don't need to rely on that data at all, because the commission explained it had comment on its proposal to eliminate the newspaper broadcast cross-ownership rule. It had support for that proposal from minority-owned businesses, I mean, organizations representing minority-owned businesses. It explained with regard to the radio television cross-ownership rule that, in fact, eliminating that rule didn't really have much of an impact at all on radio ownership, because under the cross-ownership rule as it existed, you were limited to seven radio stations in the local market. And under the local radio ownership rule, which was not changed, you were limited to eight. So the move of one additional radio station in the market was by itself, apart from the data, in the commission's judgment, unlikely to have an impact. And then the final, and I think most important point, is if you assume that that impact, that the commission really had no evidence one way or the other with regard to minority and female ownership, that is one aspect of a multi-factor analysis. And the commission amply explained that the other factors, competition, vocalism, and the other aspects of diversity, weighed heavily in favor of the rule revision. So, again, I'm willing to grant you that to take the data off the table, the commission's obligation was to reasonably explain its decision. And as, just to emphasize one thing... You didn't specifically take into account minority ownership, did you? I'm sorry? Minority ownership. No, but I didn't hear the question. You did specifically take into account minority ownership. We took into account both the data we had with regard to minority. I have a feeling that you did. My review of the record is that you did take into account minority ownership, but not gender. Well, I think that's not correct, Your Honor. I think our gender judgment was based on our judgment. I will grant you there was no specific data with regard to gender. That was my point. There was specific data with respect to minority ownership, but there was not with regard to gender. But this is my point, I guess, generally. There are times when an agency is taking an action for the first time. This was not that case, but there are times in which that's the case. And in that case, the APA does not forbid the agency from taking action, even if it has to make a predictive judgment about what, and this is well settled, about what will happen in the world going forward. And so, at worst, with regard to female ownership, what you have is a situation where the commission is taking action on the basis of its informed judgment. Is that past jurisprudence on predictive judgments still firm in your view? Sorry, so far? Is the past jurisprudence on predictive judgments and the deference that should be awarded to predictive judgments, is that still good law? I certainly hope so, Your Honor. But yes, I do believe it is. It's based on the fact that I understand the court has lived with this case a long time, but the commission has lived with these issues for perhaps an even longer time. And the predictive judgment is taking account of the commission's expertise and knowledge in the area. And also, it takes account of the fact that under the quadrennial, Congress understood the commission to be making a broad public interest determination. And the public interest does not consist solely of the impact on minority and female ownership. Ms. Lienza and her clients would have that aspect of the public interest inquiry be the be-all and end-all. And that's entirely inconsistent with 202H and the commission's public interest inquiry. Where do you stand with regard to the 2018 quadrennial review? That has been noticed, comments have come on in, and it's pending before the commission. But what's your anticipation range? Well, Your Honor, I'm extremely reluctant to say that. I can say the commission is actively working on it. They're certainly well aware of this case and of their quadrennial review obligation. But I cannot say at this point, certainly we're not as further along as we have in other times, simply because the NPRM, it's only 2019, Your Honor. But the commission is well, I think the one thing that commission understands is that this court takes the timing obligation quite seriously. And so the commission has always taken it seriously, but it takes it extra seriously with regard to the 2018. If I might just, on the incubator program, just two quick points. Similarly sized and comparable markets, these are basically synonyms. And the idea, you can measure markets in any number of ways. It's perfectly reasonable for somebody to have assumed that the commission would use Nielsen's, but it's also perfectly reasonable for the commission to have said, look, when we're talking about an ownership rule waiver, we're going to look at the way we measure markets for the ownership rule, and that's the market tiers. And this idea of gaming the system, going into incubating the small market to use in a large market ignores the fact that business plans aren't all about the incubator program. But in fact, the commission wanted to make sure that it had a significant incentive for incubating entities to incubate, to participate in the program. So at the bottom, I think Judge Amber, you may have asked a question suggesting this, but at bottom, it's not necessarily a bad thing if in fact there is a significant benefit for an entity to incubate, even if they're incubating in a small market, which is by no means clear that business plans would force that outcome. Thank you. Thank you, Gordon. Good afternoon. Matthew Dunn for the FCC. And again, I'm just addressing ITG's challenge to the top four rule. I guess there are three points I want to make, which might lead us to discuss any questions you have about Mr. Goodman's presentation. The first is the agency reasonably found that mergers among the largest stations are the most likely to have competitive harms. We have the same finding in every quadrennial review, and it's twice been affirmed by this court. So we just want to hear the question whether there's any – how this is supported. I think the agency put it out most clearly in its 2002 order, the first time it was making a full finding and explained it at great length. But each time it's predicated on the way markets work and basic antitrust economics that mergers are likely to reduce competition. Petitioner ITG says at this point, 20 years later, we really should have some better data on this. But the truth is it's still a predictive judgment because there's a rule prohibiting these kinds of mergers. So we don't have a natural experiment in which a lot were allowed to go forward, but it's supported by very sound economic reasoning and the commission's predictive judgment. The second point I would make is once the commission has decided that it needs to take a look at mergers among the largest entities, there's the question of where to draw the line. Again, this is – I would suggest classic agency line drawing, as I believe one of Your Honor's questions indicated. And the commission has consistently drawn the line between four and five. It's found this is what is called a ratings cushion. If you look at the – the commission found that's still the case, not in every market to be sure, but in lots of markets. And of course, that's not an accident, the number four. It tends to be the case that the largest broadcast entities have affiliations with the four largest broadcast networks. The final point I would make on this case-by-case adjudication is that if there are instances in which a merger would actually benefit, the harm in which the cost outweigh the benefit, entities are welcome to come forward and show that to the agency. I would push back on ITG's assertion that this is no different than a pre-existing obligation to look at any waiver because the agency is always under that obligation. Here, I think there's a – I'll just make two quick points. One is I think there's a kind of signaling effect when the agency says outright we're open for business if you want to come forward and show that this rule shouldn't apply to you. That's not the case generally. One of the concerns – let's just take the top four rule. It looks like all the FCC did, or the commission did, was to reiterate its conclusions from 02 without getting at more current data. Well, I guess my point there, Your Honor, is that the data is not available because – I hate to say it once again, the data is not available. But here, I'm not sure what the data would be because we don't allow these kinds of mergers. I take it the data would be something like, look, in this market we allow the merger and, in fact, competition was reduced or, in fact, the prediction was wrong because competition was not reduced. But if we don't allow mergers among top four entities, then we're not going to have that kind of data. But the – Mr. Goodman's group, it looks like it cited more recent data on this issue. Sorry, what's that data? Yes, Mr. Goodman. It looks like it cited some more recent data on this issue. Oh, I guess – so I guess we could talk about if we can distinguish between a sort of conclusion that competition – that mergers hurt competition and then a separate conclusion of drawing the line at four. I think his data, if he has any data, is that there are often cases in which a third and fourth entity might merge and not become the largest entity. Is that the – okay. So that may well be the case, and I think that would – if they can merge and not hurt competition, and we wouldn't concede that all such situations would benefit consumers, but if that's the case, that would be a perfect opportunity to come in and show that to the agency under the new case-by-case approach. Do my times up? Are there other – Thank you. Perfect question. Ms. Walker. Good afternoon, Your Honors. We just, on behalf of industry, want to step back and focus on what this case is now about and what it's not about with a focus on remedies to the extent that you are persuaded by any of the petitioner's arguments. This case has morphed from a case about the into a challenge now, as Ms. Lianza said, about data on one particular issue. And our concern is that the very important and much-needed reforms that the commission finally undertook – we were just as disappointed with the delay as you were last time around – but that those reforms that the commission finally took are extremely important to broadcasters' and newspapers' ability to What reforms are you specifically talking about? The revisions to the rules at issue, the repeal of the NBCO rule, the elimination of the eight voices test under the local TV rule, and then the elimination of an implementing rule, the TVJSA rule, and then the embedded markets policy that was adopted under the radio rule. We just want to make sure that whatever happens in this court, those critical reforms, which are unchallenged in this court as a matter of competition-based analysis under 202H and all the extensive findings the commission made, are not thrown out. We agree that the FCC adequately considered the impact of those rule changes on minority and female ownership, but vacating the whole order is inappropriate. This court itself found 15 years ago – 15 years ago, I was here then too, I know you were – that the NBCO rule was past its prime. You don't look any older, I do. Thank you. None of my friends on the other side deny that newspapers are in a state of crisis, that readership is in decline, that broadcasters are facing tremendous challenges from internet-based platforms. Your law clerks, I would be surprised if any of them actually subscribe to a printed newspaper. It's a new day, it's a new generation, and broadcasters and newspapers need the freedom to compete in this industry, and throwing out the rule of forms won't help anybody. It certainly won't help minorities and women that are interested in entering this industry. How does that affect the statutory obligation to promote diversity? Well, with respect, 309J, which you did cite in Prometheus 3, you cited that in the context of talking about the eligible entity definition, and that is not part of the media ownership review. The media ownership review is controlled by 202H, which says the agency has to look at the rules, quote, in light of competition. And we take a slightly more aggressive view than the commission. We think the commission didn't need to consider race and gender at all, but certainly I don't think it's debatable that competition, the expressed statutory factor that Congress took pains to point out, has to be the most important part of the commission's analysis. And that is completely unchallenged by my friends on the other side. There are pages and pages of the commission's analysis on this issue that we think is completely correct. And then there are two rules that are being potentially swept up here that aren't even, weren't even contested at all below. The embedded markets rule, nobody said bull about it one way or the other at the agency level. It's not even preserved for your review under 405A. The TVJSA attribution rule, my friends said nothing about it until the reply brief when they claimed that in the background section of their opening brief, a parenthetical in a citation to a rule constituted an argument against the rule. That's just not credible. And local broadcasters turning to the TV, excuse me, the local TV rule submitted extensive record evidence, including at 425 of the JA, that this elimination of the eight voices test, and the commission did not go whole hog and throw out the whole local TV rule. It just got rid of the eight voices test was needed in order to help the deteriorating financial condition of broadcasters in small and medium-sized markets in particular. None of that is contested. I understand what you're saying about promoting competition, especially given the landscape involving the cable and the internet, but why can't you do that while at the same time meeting the statutory requirement of promoting diversity? Well, again, with all respect, Judge Fuentes, 309J does not apply in the commission's quadrennial review. 309J applies when the commission is holding auctions and creating bidding preferences for auctions. This is not about auctions. This is about the quadrennial review. In connection with that, one of the factors is to create more diversity, is it not? The commission has taken the view that it is a factor that it voluntarily considers under the public interest standard, but I go back to my point that that voluntarily adopted regulatory factor cannot be more important than the explicit statutory factor that Congress set forth in the statute. But even if you were concerned about the commission's data or even if you were concerned about its diversity analysis, although we fully support the FCC on that, the proper remedy is at most a remand of those portions of the reconsideration order that go to that particular issue. So a targeted remand for a redo of that analysis to the extent that you're not satisfied. But throwing out the entire order would cause serious damage to newspapers and broadcasters, and indeed to the minorities and women that would like to go into this business. This business needs the freedom from these outdated rules. These are rules from the 1970s, Your Honor. The 1990s. They're updated. I mean, they're updated every four years, supposedly. I mean, in fact, there's been, since we've been involved in this matter, a considerable movement in connection with how the commission approaches these rules. But if you were to throw out and vacate the entire reconsideration order, we'd be back to the 1970s and 1990s versions of the rules. Because as you know, the change has been evolving. So far, we haven't vacated or thrown out a full order. I agree, and that actually makes my point. But what Petitioner is asking for is extreme, and it's not tied to the particular errors that they allege. If they think there's an error with respect to the data and the analysis on the race and gender analysis, then at most, you should remand for a redo of that analysis. And my friend, Ms. Leanza, conceded that it would not be futile to remand, which is the test under Allied Signal and your test under Prometheus 3, because I heard her say that data could be corrected and it could be done on remand. And if that's true, then the normal Allied Signal test is in play, where it's conceivable, as you said in Prometheus 3, that the agency could substantiate its rule and do a better job on remand. We think that is the most you could do with respect to a remedy in this case, if for some reason you were not happy with the answer. Your Honor, I think it's first important to note that the rules that apply in small and medium market television have remained unchanged since 1964, and there is no one who believes that the competition, the competitive situation for stations in those markets... That's the last time Cleveland Browns won a championship. Something like that, Your Honor, but their competition is more or less even. Ours is not. The growth of cable, the growth of the internet, for example, just to give one fact, Google alone has more ad revenue in almost every television market than all the TV stations combined. That is a tremendous change in the competitive situation and what in small markets is make changes in its rules to reflect changes in competition. Let me make a couple of points. First, with respect to gender, a question Judge Fuentes, you've asked, I would just point out that many of IPG's members are female owned, including two of the three groups who submitted affidavits in support of standing. They want to expand their ownership. They are prevented from doing so by the commission's refusal to modify its top four rule. Now, let's talk about the justification for the top four rule. Mr. Dunn suggests that the commission had studies which showed that murderers among the largest entities would have adverse economic consequences. There is one study. It's all theory. It says these are testable and they should be tested. There's been no test over 20 years. The commission, he suggests there is no test. The FCC in 2003, 2006, 2014, has each time said that commonly operated stations in all size markets improve their programming and are more competitive. There is data. The FCC in 2002 specifically called for waivers. It had a list of factors that it wanted for waivers of the top four rule. However, in all that time, not one has been granted. The one pending request, which is pending for 13 months, involves a combination of a two and three station with a very dominant number one. The commission has let it sit. So there is ample data. What the commission refused to do was understand that the benefits of competition that it recognized and the threat from the changing competitive market applied in medium and small markets and required an actual change, not an ambiguous waiver process for the top four rule. Thank you. Thank you very much. Mr. Wade. Thank you. The claim was made that similar size and comparable markets are the same thing, synonymous. They're not the same thing. To do a similar size comparison, you would compare one versus the other market. In the market tier situation, all markets in the same tier are treated the same. It has nothing to do with the size. It's the tier. And the suggestion was that owners would game the system. It isn't gaming the system. Using market tiers invites owners to incubate in small markets so they can get a waiver in a large market. The simple fact is, for a very low price of incubating in a small market, you can get a waiver. But in a lot of situations, might that not be a win-win? Let's say you incentivize someone to participate in the incubator program and you give them a waiver. They may use it in a similar population. They may not. But they win something and there is help given to persons to get started in the industry. If the point of the incubator program was to only get minorities in women in small markets, then I would agree with you. But if the point is to try to get incubation in large markets, that's just not going to happen, Judge Ambrose, because you can incubate somebody in a small market for a very low price and get a waiver in a large market. If you had the limit that we have of the five market limit just in the top tier, that is where everybody has 45 stations, then you would incubate in a market that's similar in size, maybe smaller, and that would encourage minorities and women to have a radio station in a large market, maybe not as large as you're incubating. But you can incubate in a larger market, can't you? You can, but there's nothing to prevent that. There's nothing to prevent that. And there's nothing to prevent incubating in the New York market. There's nothing to prevent it, but there's nothing to encourage it. And it's not happening. And our view is it's less likely to happen with a comparable market definition than it would be if you limited, in other words, if you were going to incubate, if you're going to, well, if you're going to incubate in New York, probably you're going to want a waiver in New York. But let's take a top 10, the 10th largest market, say, that you're going to incubate to get in New York. At least you've had to incubate a minority or a woman-owned station in the 10th largest market, not in Wilkes-Barre. Thank you very much. Thank you so much. Ms. Williamson. Good afternoon. Your Honors, I want to be clear that my clients absolutely do challenge the local television rule and the repeal of the changes to the local television rule, including the eight distribution. All of these rules are infected by the flawed analysis and thus under the precedent. Infected by what? Infected by the flawed analysis that we've been discussing today. So we do believe that those rules in the reconsideration order should be vacated because they're infected. I do want to be clear that when we were discussing this problematic data that excludes women, it's got some other problems. And we'll be sure that we focus on that. In the second report in order, the FTC referred to this comparison. And they said, we think that this data is enough to say we're not going to further tighten the rules. But we don't think this data is probative or sufficient to justify relaxing the rules. In the reconsideration order, the FTC made the exact opposite conclusion on the same data. So it's arbitrary and capricious right there whether you want to defer to the FTC or not. And there's no notice. And in fact, it shows a decline. So the data actually, Mr. Lewis jumped over it. But he said, oh, right, after the previous consolidation event, the numbers went down. And then later over decades, they went back up. Well, it went down. Fourth, I wanted to really emphasize that the FTC, its obligation is to analyze the impact of its policies on ownership diversity. The public interest standard is localism, competition, and diversity. And race and gender ownership diversity is an important part of that. So 202H says under the public interest standard, you can't throw out a third of the standard and have it count adequately. The FTC has to balance. And they essentially threw out that part. And the FTC collects their data every other year. Every other year, all the licensees are supposed to turn in their data. But sometimes they don't. And the FTC doesn't punish them. The FTC doesn't go back. These are licensees of the commission. The FTC is perfectly capable of going back and requiring actual filings by their licensees. What data is requested by the FTC? The ownership. So if you're a person of color, your demographics, your gender, that goes into the agency every other year. The problem is it's full of holes. So you can't make comparisons with it. That's why we'd like the agency to fix it. The agency is withholding the necessary input to do the analysis your honors told it to do. In Prometheus 3 at page 50, it said, you said, if you lack the data, you must get it. And they are able to get it. They just haven't gotten it. And there's other things that they should analyze the impact. One of the things we didn't get a chance to talk about was the incentive option. This is $19 billion worth of transaction of spectrum. And the FTC has not looked at whether this is affecting race and gender ownership diversity. So they collect this data over time, the failing station rule, the change in the JSA attribution, all of these things should. With respect to that particular item that you just mentioned, does 309J apply to that? 309J is an example, I think, of the FTC's general obligation to promote race and gender diversity, which it has been. But 309 specific or generally relates to what? 309J, your honor, is, I'm not an expert on it, but I would say that it's about, it's showing the FTC a specific example of how to implement its general obligation. With regard to what? With regard to race and gender ownership. But that's not, race and gender are included among the factors there. But what does 309 relate to? There was, so 309J was about, I think, the auction process at the time. But that is not dispositive. For example, Congress just recently passed the Roy Baum Act, which we cited in the brief, and re-emphasized the importance of diversity and race and gender diversity. So we think, your honor, that it is still an important obligation. Relying primarily on 309 or is it on 151? We're relying on 151 and the public interest standard, which the FTC continues to interpret as meaning diversity. But the literal words of 151 say, thou shalt not discriminate. Correct. The promotion part is in the public interest standard. Mr. Lewis says it could get the data with respect to minority ownership, but did not have it with regard to gender. You're saying that that data both is available to the FCC? Some of it is. Now, Mr. Lewis was focusing on a change that happened many years ago. And in that case, NTIA never did collect gender data. My point is, we've had many other policy changes and the FCC has not analyzed the impact of those on race and gender ownership diversity, which are more modern and which could show an impact. But they just don't, they still are going ahead and accepting these. I'm sorry, is it the case that it's not available or is it the case that it was, but you just didn't notice it? So it depends. If you're talking about the change that happens, so what the FCC tried to do was study at one point in time, one consolidation event. The laws were changed in 96 and 99 and a lot more consolidation was at this time, just racial ownership diversity after Congress permitted radio consolidation and after the FCC permitted a lot of TV consolidation. And what it showed was that right after consolidation, racial diversity went way down. So for those two particular events, there was not gender data being collected by anyone. But we have more recent changes, ones that your honors have reviewed, failing station, JSA attribution, the incentive option that could be evaluated if we had, if the data were complete. So it depends. The FCC started in the mid to early 2000s collecting this data. So that data should be able to go back and be accurate. I mean, the FCC regulates every single transaction and every single licensee. They know who everybody is. So your honors, we do believe that I did want to just reference, because you're asking for some numbers and I just wanted for your convenience, our brief at pages 17 and 18 cites the FCC's most recent release report, which is from 2015. Joint appendix 944 and 977 offer some charts. I think those would answer your honors questions. And I just want to close with right now, according to the most recent data, people of color collectively own 7.1% of the television stations, full power television stations in this country, and women own 7.4%. After 18 years of effort, the FCC has nothing to show for it. And we believe that vacature of the infected portions of the reconsideration order and some sort of specific relief to get the homework done so we're in a better position next time will protect all parties. Thank you. You're telling me this will be a next time, huh? I hope not, your honor, but the FCC will definitely be issuing another decision. And in fact, they're relying on some of the same stuff we're discussing in their pending rulemaking. So they will make another decision and we hope that it's a better basis one. Thank you. Thank you to all counsel for very well presented arguments and briefs. I would ask that they get together with the clerk's office and have a transcript made of this whole argument and split it that side and that side evenly and go from there. Thank you for being here with us today.